

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AB:KPO

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 1, 2023

By Email and ECF

The Honorable Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Adrian Tiberiu Sandu, a/k/a "Libor Horacek," a/k/a "Anton Kubat"
       Magistrate Docket No. 23-MJ-1071

Dear Judge Pollak:

  The government respectfully submits this letter in support of its motion for a permanent order of detention for defendant Adrian Tiberiu Sandu, a/k/a "Libor Horacek," a/k/a "Anton Kubat" (the "defendant" or "Sandu"), who presents a serious risk of flight. See 18 U.S.C. § 3142(f)(2). Sandu is a citizen of Romania. Sandu was indicted in the Southern District of Florida in August 2023 for his prominent role in a bank fraud conspiracy as early as in or around January 2020 through in or around January 2023. The Indictment also included allegations of money laundering, misuse of a passport, use and attempted use of unauthorized access devices, and aggravated identity theft.

  Sandu was arrested yesterday after arriving at John F. Kennedy International Airport ("JFK Airport") and will make his first appearance this afternoon before Your Honor. Given that Sandu is a Romanian citizen with sophisticated cybercriminal skills, his use of aliases to avoid detection, his access to financial means overseas, the strength of the government's case, and the serious penalties he faces if convicted, there is no condition or combination of conditions that can reasonably secure his appearance in Court. He should therefore be detained.

I. Background

  Sandu, a Romanian citizen, used at least two aliases in furtherance of a bank fraud conspiracy involving multiple financial institutions in excess of $500,000. Specifically, Sandu and his co-conspirators installed removable deep insert skimming devices inside ATM card readers at ATMs in the Southern District of Florida and elsewhere. The removable deep insert skimming devices captured account data stored on the magnetic stripe and the Europay, Mastercard, Visa

("EMV") chip of victims' credit or debit cards. The Defendant and his co-conspirators often installed a covert removable camera on the outer portion of the ATM to capture victims' personal identification numbers ("PINs"). Sandu and his co-conspirators subsequently retrieved the deep insert skimming devices and covert cameras and re-encoded blank cards with the stolen card numbers. Sandu and other co-conspirators then used the re-encoded cards and stolen PINs at ATMs in order to cause the improper and unauthorized release of cash, for their personal use and benefit, the use and benefit of others, and to further the fraud.  In furtherance of the conspiracy, Sandu opened bank accounts with at least two different financial institutions in his name and in the names of his aliases, "Libor Horacek," and "Anton Kubat," and the accounts to deposit and launder cash obtained from the scheme.  Given his significant involvement in the conspiracy, bank accounts opened in his aliases naturally show a significant amount of cash deposits at ATMs.  In total, one alias account received over $1.1 million in cash deposits between September 2020 through July 2021, while another alias account received over $1.6 million in unspecified deposits between March 2020 and November 2020.

In addition to the bank fraud conspiracy, Sandu is charged with use and attempted use of unauthorized access devices, as well as multiple counts of money laundering, and misuse of a passport.  Though the Government is not aware of any criminal history at this time, Sandu still faces a substantial, multi-year sentence, if convicted of these counts.  Sandu is also charged with four counts of aggravated identity theft, each of which carries a mandatory two year consecutive term of imprisonment, if convicted.

Sandu resided in the Southern District of Florida until at least late summer 2023 before returning to Romania. The Government is currently unaware of a Southern District of Florida residence that he planned to return to, as prior to his departure he broke the lease for his known residences.  In May 2020, Sandu applied to adjust his status to become a lawful permanent resident ("LPR"), but Sandu abandoned this application when he left the country without permission earlier this year.  As a result, U.S. Citizenship and Immigration Services denied his application.  Additionally, Sandu was arrested with a suspended Florida driver's license.

Sandu arrived at JFK Airport yesterday, November 30, 2022, and was arrested by the United States Secret Service. Upon his arrest, law enforcement agents found Sandu in possession of multiple luxury watches valued at approximately $1,000,000, as well as several bank cards for overseas financial accounts.

II.     Legal Standard

    A.    The Bail Reform Act

The Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141–3156, provides that, in general, a court "shall order" a defendant's pretrial release unless the court determines that the defendant presents an unreasonable risk of flight or "will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  The government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community.  Mercedes, 254 F.3d at 436.

2

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the weight of the evidence against the defendant.  See 18 U.S.C. § 3142(g).

Where the evidence of guilt is strong, it provides "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

B.       Proceeding by Proffer

Evidentiary rules do not apply at detention hearings and the Government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).  In the pre-trial context, few detention hearings involve live testimony or cross-examination.  Most proceed on proffer. LaFontaine, 210 F.3d at 131.  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  Id. (internal quotation marks omitted).

III.     The Defendant Should Be Detained Pending Trial

Sandu should be detained pending trial because he poses an irremediable risk of flight. The fact he previously resided in the United States is of no moment here.  Sandu has the means and motive to disappear and escape answering for his crimes.  He possesses sophisticated cybercriminal skills that will quickly enable him to craft a new alias and re-enrich himself.  The Government also believes he has a financial cushion outside the immediate reach of U.S. jurisdiction to keep him living comfortably.  As mentioned above, Sandu used at least two aliases in furtherance of his criminal activities to avoid suspicion, demonstrating how easy it would be for him to start over and reinitiate his illicit activities under a novel alias. A Romanian citizen whose LPR application was recently denied, Sandu travels internationally frequently. And surrendering his Romanian passport does not remedy his ability to flee prosecution, for Sandu undoubtedly has the knowledge and means to easily flee this prosecution. His child and co-conspirator, with whom he shares the child, are believed to currently be living in Romania.  Sandu has every incentive to return to them and disappear into a yet another alias.

Sandu's incentive to flee is particularly acute given the substantial sentence he would face if convicted.  Sandu faces a significant, multi-year sentence even before accounting for the multiple aggravated identify theft charges, each of which carries a mandatory two year consecutive term of imprisonment, if convicted. See United States v. Blanco, 570 F. App'x 76, 77 (2d Cir. 2014) (affirming district court's order of detention where defendants face lengthy term of imprisonment).  In addition, the evidence against Sandu is overwhelming, given ATM photographs that depict Sandu engaging in the skimming operation, voluminous financial and other records, and the availability of multiple victims who are prepared to testify that they do not know Sandu, nor did they give him permission to withdraw funds from their bank accounts. See United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993) (holding that, where the evidence of guilt is strong, it provides "a considerable additional incentive to flee").

        In light of his sophisticated cybercriminal skillset, his use of aliases to avoid detection, his financial means overseas, the strength of the government's case, and the serious penalties he faces if convicted, Sandu presents a risk of flight that no combination of conditions can mitigate.

IV.      <u>Conclusion</u>

        For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will assure Sandu's return to court. He should be detained pending his removal to the Southern District of Florida.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:    <u>/s/ Katherine P. Onyshko</u>
        Katherine P. Onyshko
        Assistant U.S. Attorney
        (718) 254-6177

cc:    Clerk of Court (CLP) (by ECF)
       Defense Counsel (by email)